**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 464 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| LUIS RAMOS-GUERRERO | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Luis Ramos-Guerrero's motion to suppress [32] statements that he made to the Government on three separate occasions as well as currency that the Government seized from Defendant's home, arguing that the Government obtained this evidence in violation of the Fourth Amendment. For the reasons set forth below, Defendant's motion [32] is granted in part and denied in part. Specifically, Defendant's motion is denied regarding the incriminating statements that he made to agents on October 22, 2012, December 5, 2012, and June 5, 2013. Defendant's motion is granted regarding the $36,000 that agents seized from his garage on October 22, 2012. As a housekeeping matter, docket entry [64] should be stricken as an active motion from the Court's docket.

**I.      Background**

**A.      Procedural History**

Defendant filed a motion to suppress [32] on May 13, 2014, requesting an evidentiary hearing to resolve factual disputes relating to the evidence in question. The Government filed a response [34] on June 9, 2014, also requesting an evidentiary hearing. The Court originally scheduled the evidentiary hearing for August 28, 2014, but it was rescheduled several times. On November 14, 2014, the Government filed a supplemental response [42] to Defendant's motion, and Defendant filed a reply [45] ten days later.

The evidentiary hearing was held on May 28, 2015, and concluded on June 1, 2015. Following the hearing, the Court authorized the parties to file simultaneous supplemental briefs [see 63], which they did on August 3, 2015 [64, 65].

## B.     Factual Background

Defendant Luis Ramos-Guerrero is charged in a four-count indictment with conspiring to possess with intent to distribute 5 kilograms or more of cocaine (Count One) and distributing 500 grams or more of cocaine (Counts Two through Four). He has been released on bond since his arrest.

At the evidentiary hearing, the Government presented testimony from three officers (Special Agent Colin Dickey, Special Agent Anthony Anglada, and Task Force Officer Ruben Briones) who were involved with an investigation of a cocaine operation involving Defendant Ramos-Guerrero. The three officers testified that—prior to October 22, 2012—a confidential source ("CS") had identified Defendant as a cocaine broker who operated out of his residence at 120 Amarillo Drive in Carpentersville, Illinois.

### 1.     October 22, 2012

On the morning of October 22, 2012, the government agents arranged for the CS to make several phone calls to Defendant to set up a phony drug transaction allegedly involving the sale 8 kilograms of cocaine for $130,000, to take place in Defendant's garage.[1] Meanwhile, approximately 10 DEA agents were conducting surveillance of Defendant's home, awaiting the arrival of the targeted buyer, who was slated to arrive around 3:00 p.m. A pickup truck arrived at Defendant's home at the approximate time of the intended transaction, and Defendant came

---

[1] The CS spoke in Spanish during the phone conversations. Agent Anglada, who was present during the conversations, speaks some Spanish, but is not fluent. The conversations were not recorded, purportedly because the CS was incarcerated at the McHenry County Jail at the time, and the agents were not allowed to bring audio recording equipment into the facility. Agent Anglada did not take any notes during these conversations.

outside to converse with the driver of that vehicle. Approximately seven of the DEA agents, including Agent Anglada and Officer Briones, converged on the two individuals, explained that they were conducting a drug investigation, and instructed the individuals to put their hands on the vehicle while the officers conducted pat down searches. The agents were wearing vests with the DEA insignia and at least one agent had his weapon drawn. After the pat downs, the agents handcuffed the suspects. At some point after Agent Anglada handcuffed Defendant, Agent Anglada told Defendant that he was not under arrest but he was being detained until the officers figured out what was taking place and secured the location. Agent Anglada asked Defendant if there were any people, weapons, or drugs inside of the residence. Defendant said no, but told Agent Anglada that there was money in his garage. Agent Anglada requested permission from Defendant to search his residence, and Defendant gave his verbal consent. This consent was not documented on a "Consent to Search" form, purportedly (according to Agent Anglada) because Defendant provided verbal consent, making written consent unnecessary.

Defendant led approximately four of the agents to his back door. With Defendant's permission, Agent Anglada took Defendant's keys from his pocket, unlocked the door, and followed Defendant into the kitchen. Agents entered the home and conducted an initial safety sweep of the home to see if anyone else was present in the residence. After the initial search, Agent Anglada removed Defendant's handcuffs because, according to Agent Anglada, Defendant was not under arrest and he was no longer being detained. Agent Anglada estimates that, in total, Defendant was handcuffed for no more than 10 minutes.

After Defendant was un-cuffed, the agents searched his home pursuant to Defendant's verbal consent to do so. Agent Anglada went to retrieve the money that Defendant claimed was in the garage, finding approximately $36,000 in cash inside of a toolbox. Agent Anglada went

back into the kitchen to show the money to Defendant, who claimed that the money was from the sale of a restaurant and that he was hiding it from his wife. A canine unit indicated the presence of narcotics on the money.

Agent Anglada continued his conversation with Defendant, who was calm and cooperative. At one point in the conversation, Agent Anglada told Defendant something along the lines of: "If you're truthful with me, then I can help you." At another point in the conversation, Defendant asked if he was going to sleep in his own bed that night, to which Agent Anglada said that Defendant was not under arrest, and so there was no reason that he wouldn't be spending the night at home.[2] In his conversation with Agent Anglada, Defendant confirmed that he had participated in at least two five-kilogram cocaine transactions in his garage with the Government's CS and with a buyer named Alfonso Last Name Unknown ("LNU"), who was also the target buyer for the ruse transaction on that day. These conversations were in English, and lasted approximately 15 minutes. At no point during this interaction was Defendant read his *Miranda* rights. Agent Anglada testified that this is because Defendant was not under arrest. In total, the agents were on site for no more than one hour. Phone records produced by the Government show that during this time Defendant made and received several phone calls that had no apparent connection to the investigation. [64-1, at 1–2.]

### 2. November 22, 2012

On November 22, 2012, Agent Anglada arranged a meeting with Defendant that took place at a local gas station. During this meeting, Agent Anglada showed Defendant photographs of various individuals, asking if Defendant recognized any of the individuals as Alfonso LNU.

---

[2] Defendant points out that Agent Anglada did not include this information in any of his reports on the incident. In addition, Agent Anglada did not mention this information to the Government until he was being prepared to testify for the evidentiary hearing in November 2014, after Agent Anglada was made aware of a statement that Defendant made in his affidavit saying that the police had threatened him by saying that he would not "sleep at home" that night if he did not cooperate.

Defendant did not make any positive identifications. The two spoke in English. Agent Anglada did not memorialize this meeting, purportedly because it did not reveal any useful information. Defendant has not moved to suppress any of the statements that he made during this encounter.

### 3. December 5, 2012

On December 5, 2012, Agent Dickey (who was not involved in the October 22, 2012 incident at Defendant's home) and Agent Anglada visited Defendant, arriving at his home at approximately 10:30 a.m. Defendant had invited the agents there to ask them questions about a DEA Notice of Seizure letter that Defendant received regarding the money seized from his garage on October 22, 2012. Upon greeting Defendant, the agents asked if they could go inside to look at the letter, and Defendant obliged. The agents sat in Defendant's living room while he retrieved the letter and brought it to the agents. Defendant asked the agents how he should respond to the letter. Agent Dickey told Defendant that in order to get the money back, he would have to file a claim legitimizing his possession of the money (*i.e.*, proving that the funds were not illegally obtained), and Agent Dickey advised Defendant to get an attorney to assist him with that process. Later in the conversation, Defendant showed the agents handwritten receipts, purportedly from the sale of a restaurant that Defendant owned to an individual named Mario Topete. Defendant claimed that the $36,000 in cash came from that transaction. The Agents advised Defendant that he should include those receipts in any claim that he might file regarding the seized funds.

After discussing the Notice of Seizure letter, the agents began asking Defendant questions about Alfonso LNU, including questions about various cocaine transactions between Defendant, the CS, and Alfonso LNU. Defendant again told the agents about his role in two prior drug transactions that occurred prior to October 22, 2012 involving the CS and Alfonso LNU,

where Defendant acted as a middle-man, bringing the supplier and buyer together for transactions that occurred in his garage. These were essentially the same incriminating statements that Defendant made to the agents on October 22, 2012.

The meeting lasted approximately 45 minutes in total, and the parties spoke in English throughout. At no point was Defendant read his *Miranda* rights, nor was he handcuffed or otherwise restrained in his ability to move about freely.

### 4.     June 5, 2013

On June 5, 2013, DEA agents executed an arrest warrant against Defendant in the parking lot of an auto-parts store. Agent Dickey transported Defendant back to his home in Carpentersville. Once at the home, Agent Anglada got into Agent Dickey's vehicle, at which point Agent Dickey read Defendant his *Miranda* warnings in English. The agents testified that Defendant verbalized that he understood his rights and was willing to waive those rights and speak with the agents. The agents did not attempt to have Defendant sign a *Miranda* waiver. In the ensuing conversation, Defendant essentially reiterated the same incriminating statements that he made to the agents on October 22, 2012 and December 5, 2012.

## II.   Legal Standard

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe").

## III.  Analysis

### A.    October 22, 2012 Incriminating Statements

Defendant seeks to suppress the incriminating statements that he made to agents on October 22, 2012 about his involvement as a broker of several cocaine transactions. Defendant's primary argument for suppressing these statements is that he was "in custody" at the time, and thus the agents' failure to read him his *Miranda* rights renders those statements inadmissible. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), "a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination." *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007) (citing *Miranda*, 384 U.S. at 444); see also *Stansbury v. California*, 511 U.S. 318, 322 (1994) ("Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial."). *Miranda* warnings are not required unless the suspect is both in custody and subject to interrogation. *Thompson*, 496 F.3d at 810 (citing *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)). The inquiry as to whether a suspect was "in custody" is an objective one, where courts "look to the totality of the circumstances and consider whether a reasonable person would have believed that he or she was free to leave." *Id.* (citing *Barker*, 467 F.3d at 628). Courts consider factors such as "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *Id.* at 810–11 (citing *Barker*, 467 F.3d at 629).

There is competing evidence as to whether Defendant was "in custody" October 22, 2012. On one hand, there was a large DEA presence outside of Defendant's home (seven officers), at least one officer had his weapon drawn during the agents' initial approach, and Defendant was placed in handcuffs for approximately 10 minutes. On the other hand, once Defendant consented to the search of his home and after the agents completed their initial safety inspection (only four of the agents entered the home), Agent Anglada removed Defendant's handcuffs, and from that point on, Defendant conversed with Agent Anglada and Officer Briones voluntarily, maintaining a calm and cooperative demeanor. The agents did not restrict or otherwise limit Defendant's ability to move during this time.

While there is competing evidence regarding custody, the scales tilt in favor of the Government once the Court considers *when* the alleged incriminating statements were made. For purposes of *Miranda*, the relevant inquiry is whether, objectively speaking, "the defendant's will was overborne *at the time he confessed*." *Miranda*, 384 U.S. at 534 (emphasis added) (quoting *Haynes v. State of Washington*, 373 U.S. 503, 513 (1963)). Here, Defendant made his incriminating statements after the initial convergence of agents in his driveway, after the initial handcuffing, and after Defendant was instructed that he was not under arrest. Defendant gave his incriminating statements inside of his home,[3] after the handcuffs were removed. During the 15-minute conversation in which Defendant made his incriminating statements, Defendant conversed with two agents (Agent Anglada and Officer Briones); there were no weapons drawn, and the agents did not touch, threaten, or restrain Defendant in any way. The other agents in the home (approximately two) were searching the home pursuant to Defendant's verbal consent to do so. At this point, Defendant's interactions with the agents had become consensual. As such, a

---

[3] The Government stated that it does not intend to use at trial any of the statements that Defendant made in his driveway on October 22, 2012. [64, at 4.]

reasonable person would have believed that he or she was free to leave in that instance or at least to terminate the conversation (as Defendant was at home), and hence Defendant was not in custody and *Miranda* warnings were not required. See, *e.g.*, *Beckwith v. United States*, 425 U.S. 341, 347–48 (1976) (relaxed, three-hour interview in suspect's home did not implicate *Miranda*).

Before moving on, the Court notes that the Seventh Circuit recently reversed a finding that an individual was not "in custody" under a somewhat similar fact pattern. In *United States v. Borostowski*, 775 F.3d 851 (7th Cir. 2014), 13 officers arrived at a single family home to execute a search warrant to search for child pornography. *Borostowski*, 775 F.3d at 854. When the defendant answered the door, the agents handcuffed him and kept him outside for 25 minutes in 40-degree weather with an agent standing by his side. *Id.* at 860. At one point, the defendant called to his sister in the home to get him an attorney. *Id.* The agents then led the defendant, still handcuffed, inside the home into a small upstairs bedroom where an armed agent stood between the defendant and the door. *Id.* Once there, the agents un-cuffed the defendant and told him that he was not under arrest or in custody, and then embarked on a three-hour interrogation. *Id.* The agents' questioning was never hostile or combative, and the defendant expressed a willingness to cooperate. *Id.* The 13 officers remained in the home, and separated the home's other occupants and prevented family members from entering or leaving the home for a period of time. *Id.* The agents questioned the defendant for three hours, and during this time the defendant was not allowed to leave the bedroom and walk through his own home unaccompanied; agents escorted the defendant to the bathroom. *Id.* at 861. After the interrogation, the agents shackled the defendant's arms and legs and drove him to FBI headquarters for polygraph testing. *Id.*

While the facts of this case are similar in some respects to those in *Borostowski*, there are notable differences. First, Defendant was handcuffed for 10 minutes (not 25 minutes), and the

agents removed the handcuffs after completing a cursory sweep of the home, adding credence to the agents' testimony that the handcuffs were only used until the officers were able to secure the site for safety purposes.[4] Second, the agents spoke with Defendant in his kitchen; he was not confined in a bedroom or otherwise guarded (or blocked by a guarded door). Third, only four agents entered the home (as opposed to 13 in *Borostowski*), and two of those agents were conducting a search of Defendant's home pursuant to his verbal consent to do so, whereas in *Borostowski* the agents were executing a search warrant. Fourth, there is no evidence that the agents restricted Defendant's ability to leave the kitchen (to walk to other parts of the home, or to leave the home entirely) at any point during the conversation, whereas in *Borostowski* the defendant was not permitted to leave the bedroom without an escort. Fifth, the conversation here lasted approximately 15 minutes, not three hours. Sixth, at the conclusion of the conversation, the agents left; Defendant was not bound or taken to a police station.[5] Seventh, while the defendant in *Borostowski* was kept separated from his family members during the interrogation, the agents here did not limit Defendant's communications; to the contrary, the Government provided phone records showing that Defendant made and received phone calls while the agents were at his home. [64, at 9; 64-1, at 1–2.] And eighth, in *Borostowski*, the agents relocated the defendant, taking him from the outside to a small upstairs bedroom with a guarded door, whereas here the agents followed Defendant to his back door in conjunction with his verbal consent to let the police search his home, and once inside, Agent Anglada followed Defendant into his kitchen,

---

[4] All three of the Government's witnesses testified regarding the common use of firearms by narcotics traffickers. By contrast, in *Borostowski*, the agents were searching for child pornography, and there was no evidence that handcuffing the defendant was necessary for safety purposes.

[5] The Court questions the relevance of police action *after* the incriminating statements were made. However, the Court has included this distinction here based on the court's attention to similar facts in *Borostowski*.

where the conversation ultimately took place. There is no evidence that the agents selected the kitchen as some kind of designated interrogation space.

The main similarity between this case and *Borostowski* is that in both cases there was an initial interaction with the police where the defendant was handcuffed, followed by a second, less-custodial interaction during which the defendant made incriminating statements. The question in both cases is whether the custodial nature of the primary interaction dissipated during the second interaction, such that the latter could reasonably be considered non-custodial (or, conversely, whether the custodial nature of the primary interaction carried over, adding to the custodial nature of the second interaction).[6] In *Borostowski*, the Seventh Circuit emphasized the "strong police presence" and "the use of handcuffs" in determining that the defendant was in custody in that case, even though his incriminating statements were made *after* the initial surge of agents on his home and after he was un-cuffed. But while the initial surge of agents and the handcuffing had passed by the time the defendant's interrogation began, there was still an agent guarding the door of the interrogation room while other agents roamed the house executing the search warrant, and while the defendant was not handcuffed during the interrogation, he was confined to a small bedroom where he was not permitted to leave without an escort. In that sense, the initial indicators that the defendant was "in custody" did not dissipate during the second interaction, they simply transformed into milder versions of those custodial indicia. Here, however, whatever custodial momentum accrued during the initial 10-minute interaction was slowed dramatically once the agents began the consensual search of Defendant's home, when the police presence dropped from 10 to four, and Defendant's movement was not limited in any way

---

[6] It's possible that the agents' second interaction with the defendant in *Borostowski* was custodial wholly independent of the agents' primary actions in storming the home and handcuffing the defendant because of the extended duration of that interrogation and the restriction on the defendant's movement during the interrogation (despite the agents' verbal assurances that the defendant was not under arrest).

as the parties conversed in Defendant's kitchen. In short, despite certain factual similarities between this case and *Borostowski*, the Court concludes that there are significant-enough differences to justify the determination that a reasonable person would not have believed that he or she was in custody in such a situation, despite the custodial nature of Defendant's initial interaction with the agents.

Alternatively, Defendant maintains that the incriminating statements that he made on October 22, 2012 were involuntary in that they were the result of police coercion and false promises of leniency. Whether incriminating statements were made voluntarily is judged based on the totality of the circumstances, including "whether the defendant was read his *Miranda* rights, the defendant's age, the duration and nature of the questioning, and whether the defendant was punished physically." *United States v. Villalpando*, 588 F.3d 1124, 1127–28 (7th Cir. 2009) (citations and quotations omitted). An incriminating statement is voluntary if it is "the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). Relevant here, "while a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible." *Villalpando*, 588 F.3d at 1128; *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible * * * unless government agents make threats or promises."). To succeed on a false-promise claim, a defendant must show "that his interrogator made him a promise that was materially false and thus sufficient to overbear his free will." *Villalpando*, 588 F.3d at 1128 ("The reason we treat a false promise differently than other somewhat deceptive police tactics (such as cajoling and duplicity) is that a false promise has the unique potential to make a decision to speak irrational

and the resulting confession unreliable."); *id.* ("The ultimate result of a coercive interrogation is unreliable.").

Defendant relies primarily on Agent Anglada's admission that at one point in the conversation, he told Defendant something along the lines of: "If you're truthful with me, then I can help you." This statement did not render Defendant's incriminating statements involuntary. First, there is no evidence that Agent Anglada's statement is "materially false." While Agent Anglada did testify that at the time he made that statement he did not have the authority to make any binding deals with Defendant regarding potential criminal charges, Agent Anglada also testified that he was hoping to develop Defendant into a potential informant, which could have impacted Defendant's criminal exposure. Second, Agent Anglada did not promise leniency— Agent Anglada intimated that he *could* help Defendant, not that he *would*. For these reasons, Agent Anglada did not make Defendant a promise that was materially false.

Defendant also argues that Agent Anglada coerced the incriminating statement by telling Defendant that if he did not cooperate, he would not sleep at home that night. Agent Anglada told a different story at the evidentiary hearing, testifying that after he established a rapport with Defendant, Defendant asked him if he would be sleeping at home that night, to which Agent Anglada said that he didn't see why not, because Defendant was not under arrest. Defendant questions the verisimilitude of Agent Anglada's version of the events, noting that Agent Anglada did not include this information in any of his reports on the incident, and he did not mention this information to the Government until he was being prepared to testify for the evidentiary hearing in November 2014. However, the Court found Agent Anglada's testimony at the evidentiary hearing to be credible. Defendant did not testify at the evidentiary hearing, and while he did verify his version of the events in an affidavit, his exact statement was that "police" told him that

"if [he] wanted to sleep in [his] house and see [his] family [he] *had to talk to them*." [32-1, at 1 (emphasis added).] This statement implies a much broader form of coercion—that Defendant didn't want to talk to the agents at all, let alone "cooperate"—but the evidence as presented at the evidentiary hearing indicates otherwise, as Defendant began cooperating with (and speaking with) the agents immediately, well before this alleged "sleeping at home" interaction.

Courts "analyze coercion from the perspective of a reasonable person in the position of the suspect," and consider the following factors as part of a totality-of-the-circumstances assessment: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) (quoting *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). Here, even accepting Defendant's version of the events as true, Agent Anglada's statement was not sufficient to overbear Defendant's free will. The agents' conversation with Defendant lasted approximately 15 minutes; it took place in Defendant's home in the afternoon; Defendant was not detained; the nature of the conversation was calm and cooperative; and the agents did not physically contact or spatially restrain Defendant in any way during the conversation. There is no indication that Defendant's age, education, intelligence level, or mental state increased his susceptibility to police coercion. In sum, the Court concludes that Defendant's incriminating statements on October 22, 2015 were not coerced, and were otherwise voluntarily given.

### B.    December 5, 2012 Incriminating Statements

On December 5, 2012, Defendant invited Agents Dickey and Anglada to his home to discuss the Notice of Seizure letter that he received in the mail. During the ensuing conversation,

Defendant offered up the same incriminating statements that he made to the agents on October 22, 2012. Defendant now argues that these incriminating statements were involuntary because (1) Defendant was still operating under Agent Anglada's false promise of leniency and his promise that Defendant would sleep at home as long as he cooperated, and (2) Agent Anglada told Defendant in November 2012 that if he wanted his money back, he would have to continue cooperating with the investigation.

As a preliminary matter, the Court notes that Defendant does not argue that he was in custody on December 5, 2012. Instead, Defendant's only arguments for the suppression of these statements stem from statements that Agent Anglada made prior to December 5, 2012.

As to Defendant's first argument, the Court already rejected Defendant's arguments regarding Agent Anglada's alleged false promise of leniency and his alleged threat that Defendant would not "sleep at home" unless he cooperated. For those same reasons, the Court rejects Defendant's argument that his December 5, 2012 incriminating statements were involuntary.

But even if the Court had found those arguments persuasive, that does not mean that Defendant's reiteration of his incriminating statements five weeks later would also be considered involuntary. See, *e.g.*, *Lyons v. Oklahoma*, 322 U.S. 596 (1944) (holding that even though the first confession given by a defendant had been involuntary, a second confession obtained 12 hours later was not because the coercion surrounding the first confession had been sufficiently dissipated as to make the second confession voluntary). To reiterate, an incriminating statement is voluntary if it is "the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Dillon*, 150 F.3d at 757. And "[w]hen a prior statement is actually

coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Oregon v. Elstad*, 470 U.S. 298, 310 (1985); see also *United States v. Swanson*, 635 F.3d 995, 1004 (7th Cir. 2011) (looking to "whether there has been a sufficient 'break in the stream of events'" to determine whether a voluntary statement was "insulated from the taint" of a prior, coerced statement). Also relevant to determining the staying power of a coercive statement is the substance of the statement—that is, a statement that demands future compliance (*e.g.*, an agent's statement that he or she expected compliance on all future visits) differs in kind from a statement directed at the present interrogation (*e.g.*, an agent's statement that failure to comply with a present demand would result in an immediate adverse action).

Based on the passage of time (five weeks) between the two incriminating statements, the fact that Defendant called the agents and invited them to his home, the fact that Agent Dickey was not present at the October 22, 2012 interview, and the temporally-restricted nature of the coercive statements at issue (*e.g.*, Agent Anglada's alleged comment that Defendant's failure to cooperate would mean that he wouldn't sleep at home *that night*), any taint associated with the October 22, 2012 interview had dissipated prior to Defendant's December 5, 2012 incriminating statements. Instead, Defendant's December 5, 2012 actions and statements are more indicative of a willing cooperator, not someone whose free will had been overpowered by deceptive interrogation tactics. In short, the 15-minute conversation that occurred in Defendant's kitchen on October 22, 2012 was not the type of mind-altering interrogation that would rob a suspect of his rationality for weeks to come, and Defendant's arguments to the contrary are unavailing. A person who does not wish to speak to law enforcement does not invite them to his home.

Defendant's second argument is similar, but stems from a statement that Agent Anglada allegedly made in November 2012. Specifically, in his affidavit, Defendant says that in November 2012, police asked him to review photographs to see if he could identify anyone, and told Defendant that if he wanted his money back, he had to cooperate with their investigation. [32-1, at 1.] Defendant alleges that this threat stuck with him, such that when he invited the agents to his home on December 5, 2012, this threat coerced him into making his incriminating statements. The Court is not persuaded. Again, Defendant's actions on December 5, 2012 are more akin to a willing cooperator and not a downtrodden interrogee, coerced into incriminating himself. Defendant does not allege that the agents who came to his home on December 5, 2012 (per his invitation) made any threats to him in order to elicit his incriminating statements. In addition, Defendant alleges that he felt compelled to incriminate himself in order to get his $36,000 back. But the agents had just explained to Defendant the procedure for contesting the forfeiture proceedings regarding his $36,000, specifically telling Defendant that he needed to follow those procedures in order to get his money back (while simultaneously advising him to get an attorney to help him with that process). It does not make sense that immediately after the agents explained to Defendant that they had nothing to do with his $36,000 that he would feel compelled to incriminate himself in order to protect that money. Defendant's second argument is unreasonable and must be rejected.

### C.    June 5, 2013 Incriminating Statements

Defendant once again offered the same incriminating statements to Agents Dickey and Anglada, this time while in Agent Dickey's vehicle just after Defendant's June 5, 2013 arrest. Defendant argues that these statements should be suppressed because (1) the statements were involuntary based on Agent Anglada's promise of leniency and his threats that Defendant's

cooperation was necessary to ensure that Defendant would not be arrested and to preserve the possibility that Defendant would get his money back, and (2) Defendant was not read his *Miranda* rights before he gave his statements (the parties agree that Defendant was in custody at the time).

As to the first argument, the Court reiterates its rejection of these arguments as made in connection with Defendant's incriminating statements on October 22, 2012 and December 5, 2012. The same rationale applies here. In addition, several of these arguments don't make sense based on the state of affairs on June 5, 2013. For example, Defendant had already been arrested at the time he made his June 5, 2013 incriminating statements, and thus it is not reasonable to argue that Defendant incriminated himself to prevent an arrest that already occurred. And the agents had explained the forfeiture process to Defendant months earlier, so it is unreasonable to think that Defendant still felt compelled to incriminate himself based on a fear that failure to do so would affect his ability to get his money back. Regardless, the Court concludes once again that Defendant's behavior was "the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Dillon*, 150 F.3d at 757.

In regard to Defendant's second argument, for a criminal defendant's post-arrest statement to be admitted into evidence against him during a criminal trial, the Government must be able to demonstrate by a preponderance of the evidence that the defendant waived his *Miranda* rights before making the statement. *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010). A defendant may waive his *Miranda* rights "only if that waiver was made 'voluntarily, knowingly and intelligently.'" *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). More specifically, the waiver inquiry

"has two distinct dimensions." *Moran*, 475 U.S. at 421. A waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Additionally, a waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

In determining whether a defendant waived his *Miranda* rights "voluntarily, knowingly and intelligently," courts evaluate the "totality of the circumstances" surrounding the waiver.[7] *Moran*, 475 U.S. at 421. Courts generally will hold that a defendant's waiver is knowing and intelligent if he "understands that he can refuse to talk to the people asking him questions or stop the questioning once it begins; that the people asking him questions are not his friends but are police or law enforcement personnel who are trying to show he is guilty of a crime; that he can ask for and get a lawyer who will help him; and that he does not have to pay for that lawyer." *Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the Miranda warnings that the courts have found an unintelligent waiver." *Id.*

Here, both Agent Dickey and Agent Anglada testified that Agent Dickey read Defendant his *Miranda* warnings prior to questioning Defendant on June 5, 2013, and that Defendant confirmed verbally that he understood his rights. The agents' testimony was consistent and credible on these points. Defendant faults the agents for not asking him to sign a *Miranda* waiver. However, a written *Miranda* waiver is not required under the law, and both agents testified that *Miranda* warnings were given verbally and Defendant stated verbally that he understood those warnings and agreed to answer the agents' questions anyway. See *United States*

---

[7] Although whether a defendant made a knowing and voluntary waiver of his *Miranda* rights is a separate inquiry from a claim challenging the voluntariness of a confession, *Etherly v. Davis*, 619 F.3d 654, 662 (7th Cir. 2010), "in evaluating whether a [defendant] voluntarily waived his Miranda rights, [courts] consider the same factors * * * considered * * * in assessing the overall voluntariness of a confession." *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 (7th Cir. 2005).

*v. Heron*, 564 F.3d 879, 886 (7th Cir. 2009) ("Heron notes that [the agent] did not obtain a written *Miranda* waiver, but this alone does not make Heron's statement involuntary."); *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000). There is no indication that the agents coerced Defendant into waiving his rights, or that Defendant—whose first contact with the DEA occurred over seven months prior—was unaware of the consequences of abandoning his rights. For these reasons, Defendant's second argument is also unavailing.

### D. Suppression of Currency Seized on October 22, 2012

Defendant argues that the $36,000 in cash that Agent Anglada seized from his garage should be suppressed because (a) Defendant was in custody and un-Mirandized both when he told the agents about the location of the money and when he consented to the search of his home, and (b) Defendant involuntarily consented to the search that led to that money (it is undisputed that the agents did not have a search warrant). The legal standards for when a suspect is "in custody" and when an incriminating statement is "involuntary" are set out in detail above.

To recap the facts, prior to October 22, 2012, DEA agents investigating a drug-trafficking operation received information from a confidential source that Defendant had, on multiple occasions, used his garage to broker cocaine transactions. On October 22, 2012, agents used the confidential source to set up a fake drug transaction involving Defendant and a targeted cocaine buyer, who was supposed to arrive at Defendant's home with $130,000 in cash to purchase 8 kilos of cocaine. At the time when the transaction was set to occur (approximately 3:00 p.m.), a vehicle pulled into Defendant's driveway, and Defendant and the driver of the vehicle began conversing in front of Defendant's home. Approximately seven DEA agents approached the suspects (at least one agent had his weapon drawn), ordered them to put their hands on the vehicle, patted them down to search for weapons, and then handcuffed them. While Defendant

was handcuffed, Agent Anglada asked him if there were guns or drugs or anybody in the house. Defendant answered "no" to that question, but told Agent Anglada that there was money in his garage. Agent Anglada then asked Defendant if the agents could search his house for drugs or guns, and Defendant gave his verbal consent. Agent Anglada did not obtain written consent from Defendant to search his home. Defendant was not given his *Miranda* warnings at any point during this conversation, although Agent Anglada did tell Defendant that he was not under arrest.

The Government does not contest that Defendant was in custody when he spoke with agents in his driveway. The Government also concedes that it "does not intend to use any of [D]efendant's statements while on the driveway," mooting any issue regarding Defendant's statement that he had cash in his garage. [64, at 4.] Instead, the Government argues that despite being in custody, Defendant voluntarily consented to the search of his home, rendering lawful the agents' subsequent seizure of the $36,000 found in Defendant's garage.

"The Fourth Amendment's prohibition against warrantless searches does not apply when the defendant consents voluntarily to the search." *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007) (citing *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006)). The Government bears the burden of proving that a defendant's consent was voluntary. *Id.* Assessing voluntariness is a fact-dependent inquiry that turns on the totality of the circumstances. *Id.* Among the factors courts consider are: "'(1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent.'" *Id.* (quoting *Sandoval-Vasquez*, 435 F.3d at 744).

Several factors weigh against the voluntariness of Defendant's consent in regard to the cash in the garage. First, Defendant was not read his *Miranda* rights. Second, Defendant was in police custody at the time—*i.e.*, he was handcuffed.[8] And third, although Defendant's consent was immediate (*i.e.*, it was not prompted by repeated requests from the agents), Agent Anglada requested consent shortly after seven armed DEA agents (at least one of whom had his firearm drawn) swarmed onto Defendant's property. The added intimidation factor of such a large police presence weighs in favor of involuntariness. In addition, although not required by law, Agent Anglada failed to have Defendant sign a consent form regarding the search of his home. The Government claims that Defendant understood the agent's request and points out that he was not subject to a lengthy detention and that the agents did not use any physical coercion in requesting consent. However, considering the totality of the circumstances—and especially the large police presence, the handcuffs, and the absence of any *Miranda* warnings—the Court concludes that Defendant's statements in regard to the cash in his garage were not voluntary.

The Government argues in the alternative that even if Defendant did not consent voluntarily, the evidence is still admissible under the inevitable-discovery doctrine. See *Nix v. Williams*, 467 U.S. 431, 444 (1984). This doctrine says that "when the Government can establish by a preponderance of the evidence that the information obtained would have been discovered ultimately or inevitably by lawful means, the deterrence rationale of the exclusionary rule no longer applies and the evidence should be admitted." *Johnson*, 495 F.3d at 543. "The prosecution must establish that it had probable cause and prove the existence of a chain of events that would have led to a warrant * * * independent of the search." *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003) (internal citations and quotation marks omitted); *United States v. Marrocco*,

---

[8] At some point, Agent Anglada told Defendant that he was not under arrest, but it is unclear whether he said this before or after requesting consent to search Defendant's home.

578 F.3d 627, 639 (7th Cir. 2009) ("[The Government] must prove that a warrant would certainly, and not merely probably, have been issued had it been applied for." (quoting *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008))).

Even if the agents had obtained a warrant, the Court is not convinced that the discovery of the money was inevitable. The evidence showed that Defendant used his garage to broker drug deals: simplified, that means that a buyer (with money) and a seller (with drugs) would meet in Defendant's garage and exchange the money for the drugs. In other words, based on the information provided by the CS, the agents knew that a (fake) drug transaction was set to take place in Defendant's garage on October 22, 2012, wherein an unknown buyer would bring $130,000 in cash to Defendant's home to exchange for (nonexistent) drugs. Assumedly, then, any warrant to enter Defendant's home would be contingent upon the buyer entering the home. As it unfolded, the agents intercepted Defendant and the (incorrectly) assumed buyer in the driveway, preventing the need to enter Defendant's home at all. Because there was no convincing evidence that anyone other than Defendant entered Defendant's home on October 22, 2012, and because there was no evidence that the actual buyer ever arrived at Defendant's home on October 22, 2012, it seems unlikely that the agents would have established a valid reason to enter Defendant's home on October 22, 2012. The agents argue that Defendant may have had "drug ledgers" inside of his residence, based in part on Defendant's prior drug brokerings and in part on the fact that Defendant traveled outside of his home that morning and, after doing so, told the CS that he counted the money that would be used in the drug transaction. But the Government's argument is conjecture, as there was no evidence that Defendant ever used drug ledgers or that he kept them in his home. At best, the agents would have obtained a warrant allowing them to enter the home to interrupt the staged drug transaction, but because that

transaction never transpired, the Government cannot show "that it would have conducted a lawful search absent the challenged conduct." *United States v. Pelletier*, 700 F.3d 1109, 1116–17 (7th Cir. 2012). Defendant's motion to suppress the $36,000 must therefore be granted.

## IV.   Conclusion

For these reasons, Defendant Ramos-Guerrero's motion to suppress [32] is granted in part and denied in part. Defendant's motion is denied regarding the incriminating statements that he made to agents on October 22, 2012, December 5, 2012, and June 5, 2013. Defendant's motion is granted regarding the $36,000 that agents seized from his garage on October 22, 2012. As a housekeeping matter, docket entry [64] is stricken as an active motion from the Court's docket.

Dated:  October 28, 2015 _____
Robert M. Dow, Jr.
United States District Judge